Good morning, your honors. May it please the court. My name is Carlos Cruz, and I represent the petitioners. Your honors, in this case, the Board of Immigration Appeals erroneously affirmed the affirmation that petitioners that failed to establish changed circumstances materially affecting their claim for political asylum based on two primary reasons. First, the immigration judge found that the petitioner was not credible in her testimony regarding her conversion to Christianity. And second, petitioner's conversion to Christianity was, in fact, a change in circumstances which did affect materially her claim for political asylum. So there's no dispute that this claim was brought to light unless there was a change in circumstances? That is true, your honor. The application was not filed within that one-year period under Section 1158A2B. So in this case, the issue is whether or not, first of all, whether or not the petitioner was credible in her testimony. And the judge offers at least four reasons for why he disbelieves the petitioner in this case with regards to her conversion to Christianity. What's most important in this case, your honors, is that the judge completely disregarded the minister from the Baptist Church who appeared on behalf of the petitioner at the very first merits hearing conducted in this case in December of the year 2004. I haven't read the record yet, but in your brief, it's very brief on what he said. And she obviously wasn't talking about the crucifixion, the resurrection of Jesus Christ or any of those things. So what did he talk about? Well, Judge, he talked about the fact that he baptized her, that he met with her prior to her conversion to Christianity, that she met with other officials from the church prior to that conversion, that she attended services for about three months before her conversion. Well, attendance usually doesn't get you into a Baptist church. And I was raised as a Baptist. Yes, your honor. So what kind of lessons was she taught? Your honor, there is really no information in the record regarding the information or the lessons that this petitioner and her son were offered prior to their conversion to Christianity. What we do know about the pastor is that he is the senior minister at this Baptist church, that he did meet with the petitioner. And so there's a reasonable inference that he certainly spoke to the petitioner and her son about Christianity, about the Bible, about Jesus Christ. She didn't mention any of that, did she? And she didn't, Judge. But there is a small reference by the petitioner in the record which the judge did not mention in his decision. She did say at page 187 of the record that for a long time she had decided to become Christian. And this was prior to the husband's, excuse me, registration under the Ed Sears program. She also mentioned in the record that if I do a sin, this is a quote from the petitioner herself, if I do a sin and if Jesus forgives me, I'll be forgiven and that's why I follow the religion with faith. Now, there aren't a lot of statements such as those in the record, but there is some information, at least some statements on the part of the petitioner regarding her faith in the Christian religion, aside from her belief about the way Christians live their lives. There's a great deal of testimony about the freedoms that Christians enjoy, about the absence of separate laws for men and women in the Christian faith. And she was drawn to Christianity for those reasons among others, but certainly there is a generalized discussion by the petitioner regarding her Christianity and her belief in Jesus Christ. And I think that's relevant and something that the immigration judge completely omitted from his decision in this case. But, Your Honor, going back to the pastor in this case, the judge basically says that he is going to disregard the testimony provided by the pastor because he, quote, didn't have an accurate memory of when the petitioner started attending church. Now, this is a pastor that testified a year and a half prior to the judge making his decision and all the judge says is that the pastor mentioned that he had met the petitioner and his son sometime on August 15, 2003. First of all, the pastor never said that. I've analyzed this record and there's absolutely no indication that he met her specifically on that day. The pastor did say that he met her sometime in August, late summer of that year, 2003. There's also a letter that the judge cites to dated October 1, 2003, that the judge relies on to say that the pastor actually met this person in October and not in August of 2003. But the letter simply acknowledged her presence at a church function, at an event that she attended. And there's a brochure attached to that letter that simply provided a schedule of the various services provided by the church and there's certainly a statement that says welcome to the Baptist Church, but it wasn't a letter or brochure directed at the petitioner herself. It was a generalized statement simply providing the times and the dates for various ceremonies being conducted there. And yet he relies on that particular information to then disregard the pastor altogether. However, this court should not accept that total disregard of that testimony because the pastor was credible and did provide support for her conversion into Christianity. He met with the petitioner and her son. There's indication in the record that he is a Ph.D., that he is a senior minister, and certainly the court has to believe that he spoke to this person, the petitioner and her son, about the tenets of Christianity. But Your Honor is absolutely right that asylum is not going to be based on whether or not she is extremely familiar or completely familiar with the tenets of Christianity. Both the Second Circuit and the Eighth Circuit have found that someone with less knowledge of the tenets of Christianity is equally deserving of political asylum. And so in this case, the reasons that are offered by the immigration judge should be questioned by this court because they are not supported by the record. Now, the judge does offer other reasons in support of this adverse credibility finding. For example, and this is a point that the court should note because government counsel is going to raise it, the judge says that the petitioner did not know the name of the church that she was attending. Government counsel in its brief alludes to that as well, but that is a false statement. The pastor testified that the name of the church is the Riverside Baptist Church. The letterhead provides that the name of the church is the Riverside Baptist Church. On direct examination, she testified that the name of the church was, quote, that the name was Baptist Church Magnolia in Riverside. The only addition to the name is the name Magnolia. Now, on direct examination, the judge, recognizing where that was coming from, asked, at page 184 of the record, at Magnolia, because he realized that the church is located on Magnolia Avenue. Hence the reason for why this petitioner would affiliate the name Magnolia with the name of this church. But the judge doesn't address that point in his decision and completely fails to recall a year and a half after the pastor testified that the church was located on Magnolia Avenue. The judge also says that he is not persuaded by the petitioner in this case because she spoke about that the petitioner now found anything about equality in the Bible. And therefore, he could not believe the petitioner because of her emphasis on equality, and yet there is no reference in the Bible about equality. But what the judge doesn't mention is the absence of separate laws for men and women in the Bible and the way that women are treated in that Muslim faith as stated by the petitioner during her testimony. There's a great deal of testimony regarding the way that she perceives Christians live in the United States. The judge says that when he asked her, why are you... So I found it a little odd that she should ascribe the freedom enjoyed by women in the United States to their being Christians rather than being in the United States. Your Honor, no one questioned the petitioner about that particular point. I thought it was odd. And I understand that, Your Honor. But at the same time, there is enough reference by the petitioner regarding the Christian faith. She spoke briefly about the story of Joshua and David, and although, granted, she could not recall the entire story or the lesson that she had learned in Bible study, or in Bible school, we cannot fault the petitioner, having grown in a Muslim country, in a Muslim faith, to somehow associate Christianity with the freedom that women enjoy. That was her perception. Well, I mean, the question here, for purposes of credibility... Yes, Your Honor. ...is whether she is testifying that she wants asylum because she's a Christian, fears persecution on account of being Christian, or whether she wants to stay in the United States because she likes the United States. And that's the credibility question. Yes, Your Honor, and I understand that. Some of these points that you're raising really do relate to whether or not her reasons are because of her fear on account of her Christian beliefs. Yes, Your Honor, I understand. That would be a concern in any case involving a Muslim individual who converted to Christianity after the person entered the United States and then filed for political asylum. And so that's why the testimony of the pastor is so relevant and critical in this case in assessing whether, in his expert opinion, as the senior minister, he believes that this individual is Christian. He testified at the hearing that, in his opinion, she is Christian. At the time that he testified, December of 2004, she had been attending church for approximately a year and a half. And he testified that she had been attending regularly, on a regular basis, since she started coming to church sometime in August of 2003 until he testified in December. He again provided another statement prior to the conclusion of proceedings in support of this application. So there is information here that shows that the petitioner was, in fact, going to church, that she did believe in the Christian faith. And although there are concerns because of her emphasis on her beliefs about the equality for women in the Christian faith, that should not be used to disregard the other portions of her testimony. Okay. What is the evidence that she faced, that Christian women faced persecution in vain? Yes, Your Honor. There are several articles, but I think the most crucial in this case are the two letters that were received by the husband in this case that the judge also questioned. There were two letters that were sent to the husband from the family asserting a fatwa that was issued by the local mosque, a mosque that apparently the family belonged to. And it was her testimony that she would be killed if returned to Bangladesh by priests from the mosque, members of the mosque, other Muslims, and even her family in this case. Now, the judge says that he is troubled by the letters because, first of all, the letters were not submitted until the last day of the hearing. And that is in his decision. But this is completely false. Again, this is an immigration judge who has failed to recount testimony in the record given the length of time that passed from the first hearing up until the date of the decision, which was approximately one and a half years. Did he have a question how the mosque would know of her conversion? He did question that, and the judge did call for speculation on the part of the petitioner. She provided various answers, none of which satisfy the judge, none of which may satisfy this court. She said because perhaps her in-laws were depressed, because her husband had told a brother, maybe he had mentioned it to someone, because the husband had spoken to someone in this community and someone in their community had then forwarded that information to someone in Bangladesh. We really don't know how that information was revealed to the mosque, but what we do know is that she received these two letters and that the judge undermined the value of the letters because they were not offered until the last day of the hearing. But at page 175, Judge Gould will the question. Yes, sir. Is the standard here in reviewing the adverse credibility decision whether we can say that the record compels the conclusion that she is credible? Can we weigh the evidence? There's some on her side, some on the other side. Yes, sir. Don't you lose the case? That is the standard, Your Honor, but this court has also held that the immigration judge is required to provide specific, cogent reasons for any stated disbelief. This is a substantial evidence standard, and unless the evidence compels a contrary result, then the court must defer to the immigration judge. But on that point, I'd like to make reference to a quote in the case where the court did find that Christians were being persecuted in Bangladesh. In that case, the immigration judge, as in this case, completely disregarded some of the testimony and other country reports in favor of reports that supported his position. And the court there said that the judge has an obligation to explain why he chose to credit selected portions and disregard others. In this case, this particular immigration judge did not provide any explanation whatsoever for why he considered certain portions of the testimony, certain country reports, but failed to consider other portions of the testimony, witnesses that came forward on behalf of the petitioner, and country reports that do, in fact, establish that she will suffer persecution if, in fact, she is deported to Bangladesh. And so on the basis of his complete failure to even address the evidence in the record, the court should not defer to the immigration judge's adverse credibility finding. Thank you. Yes, Your Honor. With regards to the issue of conversion, the judge says that there are only three reported incidents where Christians who converted have been persecuted in the country of Bangladesh. This is, again, false. There is absolutely no evidence in this record to even suggest that only three individuals who have converted to Christianity have been persecuted. In this particular case, there are countless reports, and the record is repleted with this information, regarding Christians who are being persecuted because of their faith and Muslims who have been persecuted as well because of their conversion. That statement on the part of the judge is not supported by the record whatsoever. Your Honor, I see I have a few seconds left. I'd like to reserve that for rebuttal, if I may. Thank you. If it pleases the Court, David Whatmore for the Attorney General. Your Honors, this case represents a pretty clear-cut finding by the immigration judge that there simply was not a credible demonstration of either changed personal circumstances or circumstances that would materially affect the asylum application. Therefore, substantial evidence supported the finding that the untimely asylum application could not go forward, as well as substantial evidence that both the withholding of removal and CAT claims were not proven by the petitioner. With regard to the finding that the conversion was, in fact, a sham, I mean, one only needs to look at the timing here. The petitioner and her family were admitted on a visitor's visa back in December of 1993. Approximately nine and a half years later, on June 12, 2003, DHS served the petitioner's husband with a notice to appear. Approximately two months later, she's suddenly at a Baptist church communicating with a pastor. Five months after that, she's being baptized as a Baptist. And four days later, she's filing an asylum application. Perhaps the conclusion could be drawn that she had a religious epiphany. The immigration judge looked at the other evidence and looked at her testimony and said, no, she was, in fact, simply doing this to more or less gin up an asylum claim, not based on her political opinion, which is what petitioner's counsel stated, but it's, in fact, a claim on account of her religious belief and the fact that she claims to be persecuted on that basis. With regard to it being a sham, she did, in fact, give the wrong name of the church. Magnolia Avenue? I believe it was. I mean, it's a minor difference, but she was asked repeatedly, and one would think that you would actually know the name of the church at which you're attending rather than simply a street address. When she was asked about why she wanted to convert, what was the basis of this, she stated freedom of speech in the United States she enjoyed. When she was further pressed on that, she said, I enjoy women's rights. That's not a central tenet of Christianity. It's something that the United States certainly affords its citizens, but it's not something that's unique to Christianity, as Your Honors noted. When further pressed, she stated, I love this country. This is like my own country. Again, these aren't a basis for her belief that her Christianity will lead to persecution. It shows her belief that it would be better for her to remain in the United States, and she'll do what it takes to attempt to make that happen. This ultimately led the immigration judge to conclude, it is clear that her true purpose is to enjoy the benefits and values of a Western society, certainly a noble objective, but not one that is supported by these asylum laws or a finding that she would be persecuted on account of her religion. And even if the conversion was, in fact, legitimate and not a sham, she certainly didn't demonstrate that it would materially affect an asylum claim so that it could go forward and have an exception to the one-year bar. The immigration judge pointed out numerous inconsistencies in her testimony regarding the strictness of her in-law's religion. She testified that she would have to go back and live in her in-law's home, who she described as orthodox Muslims who reject Western values. However, she stated that after moving to the United States for approximately 10 years, she spoke on a regular basis with her in-laws, despite the fact that she testified that they adhered to a strict version of Islam that required families to live together and that they abhorred Western values, knowing that both petitioner and her husband, their child, were all living in the United States, had no indication that they were ever going to return to Bangladesh, and that they had adopted Western values, such as wearing Western clothing and following Western norms. She also had no explanation for why her husband's family didn't reject her when she came here, even though she admitted that these things violated Muslim rules. There was simply no explanation for that. Again, when they asked why they would tell anybody about this conversion, if it would bring shame on their family or perhaps endanger them, she really had no explanation. She speculated that, quote, probably they spoke the word because they were depressed. That just doesn't make any sense. If this is going to simply endanger your family, possibly lead you to be cast out of your community or endanger your loved ones, and in her view even potentially lead to murder, why would you say anything? It just doesn't make any sense. And then we come to the letters, and the letters are perhaps the most galling of all. Both of the letters are dated October 28, 2003 and November 3, 2003. Both of them were actually postmarked prior to her conversion. This is before she was actually baptized on November 16. However, despite that, in the October 28 letter, which was approximately three and a half weeks before she converted, it states that she did convert and that there was a fatwa instituted against her. That simply doesn't make sense. She had not, in fact, converted at that time. She had gone and talked to a pastor a few times, but why would an imam back in Bangladesh be issuing fatwas when there was nothing to actually issue a fatwa about? Additionally, with regard to them being withheld, which the immigration judge also noted was highly suspicious, they appeared on the day of the hearing. This was after all the other evidence was introduced. There was no mention of these letters prior to that, and all of a sudden, just before Petitioner is going to give her testimony before the immigration court, these letters magically surfaced. Now, we also need to look at some various defects within the letters themselves. Even though both letters were purportedly sent from Bangladesh, they contain no stamps on the actual letter. I think this is all quite well set out in the briefs and in the administrative decision. Yes, Your Honor. Would Your Honors like to hear anything regarding the corroborating evidence, the use of the country reports and religious reports? Well, I was interested in two points in the country reports. One is, do they indicate the percentage Muslim versus Christian population? Because my impression was it was a country that was almost all Muslim these days. The second is, whether the country reports indicate that Christian converts are subject to these kinds of fatwas and death-like retaliation. Your Honor, I can't give you an exact citation offhand. I can check the record, if you would like, regarding the percentage of Muslim versus other religions. The reports do talk about the presence of Hindus and Ahmadis, as well as Christians in Bangladesh. But I can't give you an exact percentage offhand. You don't have to give me a percentage. I'll check the report myself. With regard to your second question, whether they do talk about this, in fact, that's one of the things that the immigration judge noted, that the stark absence of any sort of report regarding persecution of Christian individuals or individuals that had converted to Christianity. The 2004 religious report states, citizens do not perceive Christians as Western society surrogates, and Christians are not targeted or harassed in response to the widespread perception by citizens that the U.S. led a war on global terrorism. It's anti-Muslim. That report made no mention of violence against Christians or converts. It does indicate that there was some violence, but against different religious groups. So it does address the question. And by not mentioning the Christians, that absence, I think, would be a fair conclusion to draw that it was not occurring, it was not found in the report. It also mentioned that there were no fatwas or mistreatment of women who had converted to Christianity. That's simply absent from the report. The 2005 country report, each of them mentioned a couple of examples where there was some sporadic violence here and there against less than five individuals, but there was no widespread or endemic harm against Christians or Christian converts. And, in fact, the country reports indicated that women were allowed to work outside of the home, in contrast to petitioners' claims. That's in the 2004 country report. It also noted that Bangladesh is a female prime minister at the time. Seven women sit in a 300-seat parliament, and a new law requires- I've heard enough, and thank you. Okay. Does the court have any additional questions? No. Thank you. We'll submit. Thank you, Your Honors. I'll give you a minute. Thank you, Judge. I appreciate that. Judge Koh, in response to your question, there is 88 percent Muslim living in Bangladesh today and approximately 1 percent, 1 to 2 percent Christian, depending on which report you believe. But with regards to fatwas being an issue for Christian converts, there is a case, a Gomez case, talks about an individual who was persecuted. And, in fact, the State Department provides in a report, in a statement documented in that report, that an individual did convert, a Gomez, Christopher Gomez, converted from Muslim to Christianity and was thereafter murdered. Although someone was arrested, that person was released two weeks later, and no one else had been arrested or prosecuted following his murder. And so there is information in the actual State Department report regarding individuals who are converting, not because of a fatwa but because of the actual conversion. Now, aside from the State Department report, there are other reports from U.S. Newswire, which are contained in the record. There are reports from ChristianDay.com, among others, that deal specifically with conversion, individuals who have converted from Muslim to Christians who have been murdered because of that conversion to Christianity, which I think the court should note. Thank you, Your Honor. I appreciate that. Thank you. The case just argued is submitted for decision. We'll hear the next case, which you'll have to help me on this, Kittidimari and Tuoldi v. Holder.
judges: McCuskey, Schroeder, Gould